**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CINDY CURTIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 11 C 2448 |
| v. | ) | |
| | ) | Jeffrey T. Gilbert |
| HARTFORD LIFE AND ACCIDENT | ) | Magistrate Judge |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Cindy Curtis ("Curtis") filed this lawsuit under § 502(a)(1)(B) of the Employee

Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), seeking to

recover long-term disability benefits under a plan that her former employer established through

Defendant Hartford Life and Accident Insurance Company ("Hartford"). The parties have

stipulated to a "trial on the papers" under Federal Rule of Civil Procedure 52(a). *See, e.g., Hess*

*v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001) (deciding that a trial on

the papers is an appropriate procedure for resolving ERISA disputes). Having reviewed the

written record, the Court enters the following findings of fact, found by a preponderance of the

evidence, and conclusions of law, and finds in favor of Curtis.[1]

**FINDINGS OF FACT**

**A. The Parties**

1. Curtis was born in 1960 and has been a resident of Kankakee, Illinois at all times

relevant to this litigation. (Plaintiff's Proposed Findings of Fact [88] ("Pl.'s PFF") ¶ 1.)

---

[1] To the extent that any findings of fact set forth below may be considered conclusions of law, they should be so
deemed, and vice-versa.

2.     Curtis was employed as an operating room registered nurse at Children's Memorial Hospital ("Hospital") from February 1987 until January 2007. (Pl.'s PFF ¶ 13, Defendant's Proposed Findings of Fact [87] ("Def.'s PFF") ¶ 1, Curtis Social Security Administration Record [103] ("Curtis SSA") 175.)

3.     As a Hospital employee, Curtis was covered under the Hospital's Long Term Disability Plan ("Plan"), which provides long term disability ("LTD") benefits through an insurance policy issued by Hartford. (Pl.'s PFF ¶¶ 2, 3.)

**B. Relevant Plan Provisions**

4.     An employee is entitled to a monthly benefit if she becomes "Disabled" while insured under the Plan. (Hartford Administrative Record [86] ("R.") 10.)[2]

5.     "Disability or Disabled" means:

- "[For the first 180 consecutive days of any disability period], you are prevented from performing one or more of the Essential Duties of Your Occupation" (the "Elimination Period"). (Pl.'s PFF ¶ 5; Def.'s PFF ¶ 8; R. 6, 30.)

- "For the 24 months following the Elimination Period, you are prevented from performing one or more of the Essential Duties of Your Occupation, and as a result your Current Monthly Earnings are less than 80% of your Indexed Pre-disability Earnings" (the "Own Occupation Period"). (Pl.'s PFF ¶ 5, Def.'s PFF ¶ 8, R. 30.)

- "After that, you are prevented from performing one or more of the Essential Duties of Any Occupation" (the "Any Occupation Period"). (*Id.*)

---

[2] When possible, the Court cites to Pl.'s PFF and Def.'s PFF. Where that is not possible, the Court cites directly to the record.

6.     "Your Occupation" is the employee's occupation "as it is recognized in the general workplace." (Pl.'s PFF ¶ 7, Def.'s PFF ¶ 9, R. 36.)

7.     "Any Occupation" is an occupation for which the employee "[is] qualified by education, training or experience" and that has a minimum earnings threshold which is individually calculated for each employee. (Pl.'s PFF ¶ 8, Def.'s PFF ¶ 33, R. 29.) Curtis's minimum earnings threshold is $4,100.38 per month. (R. 268.)

8.     An "Essential Duty" is "a duty that: 1. is substantial, not incidental; 2. is fundamental or inherent to the occupation; and 3. can not be reasonably omitted or changed." (R. 29.) Attending work for the number of hours in a regularly scheduled workweek is an Essential Duty. (Pl.'s PFF ¶ 6, Def.'s PFF ¶ 33, R. 29.)

9.     The Plan requires a disabled[3] employee to submit "Proof of Loss satisfactory to us [Hartford]" in order to collect benefits. (Pl's PFF ¶ 11, R. 10.) Proof of loss includes, but is not limited to, any and all medical information, including medical records, diagnoses, prognoses, histories, examination notes, and treatment notes. (Pl.'s PFF ¶ 10, R. 23.)

10.     The Plan provides that Hartford will terminate benefit payments when, among other things, an employee is no longer disabled or fails to submit satisfactory proof of loss. (Pl.'s PFF ¶ 12, R. 11.)

11.     The Plan further provides that if an employee is disabled due to a "Mental Illness," benefits will be limited to 24 months total. (R. 12.) The Plan defines "mental illness" as "any psychological, behavioral or emotional disorder or ailment of the mind, including physical manifestations of psychological, behavioral or emotional disorders, but excluding demonstrable, structural brain damage." (R. 31.)

---

[3] The Court uses the terms "disabled" and "disability" as defined by the Plan.

12.     The Plan's coverage terminates when an employee is no longer actively employed full time or, if employment is terminated because of a disability, the employee is no longer entitled to benefits under the Plan. (R. 20-21.)

## C. Curtis' Coverage under the Plan

13.     Curtis was injured in a car accident on January 30, 2007 and was unable to return to work as an operating room nurse thereafter. (Pl.'s PFF ¶ 14.)

14.     She subsequently received disability benefits from Hartford at a gross monthly rate of $3,864.64, uninterrupted, for the duration of the Elimination and Own Occupation Periods. (Pl.'s PFF ¶¶ 15-16.)

15.     The Any Occupation Period became applicable on August 6, 2009. (Def.'s PFF ¶ 31.) In a July 2009 letter, Hartford notified Curtis that her benefits would terminate when the Any Occupation Period became applicable because she would no longer be disabled under the terms of the Plan. (R. 61.) Specifically, Hartford determined that Curtis could perform light to medium level work and listed a number of occupations within the physical and mental capabilities for which Hartford determined she was qualified. (R. 64.)

16.     Curtis filed an administrative appeal on October 28, 2009, requesting that Hartford reconsider its decision to terminate benefits. (R. 524-25.)

17.     Hartford upheld its decision on April 2, 2010, concluding that "the weight of the evidence does not substantiate impairment which would have prevented [Curtis] from performing Any Occupation as of August 6, 2009." (R. 54.) Specifically, Hartford determined that Curtis could work at a sedentary level with the ability to change position as, for example, a medical case manager, nurse consultant, nurse administrator, nurse educator, care coordinator nurse, or nursing care facility nurse. (*Id.*)

**D. Curtis' Medical History**

Curtis's relevant medical history is presented below chronologically by treatment provider.

**1. Brian J. Cole, M.D., M.B.A.**

18.     On October 29, 2007, Dr. Brian Cole, Curtis's treating orthopedic surgeon, reviewed an X-ray of Curtis's left shoulder and noted a narrowing of the superior aspect of the glenohumeral joint and left shoulder pain due to both capsulitis and osteoarthritis. (Pl.s PFF ¶ 19, R. 379.) Dr. Cole subsequently performed a left shoulder arthroscopic capsular release and microfracture glenoid on November 10, 2007. (Pl.'s PFF ¶ 20, R. 617-18.)

19.     Dr. Cole examined Curtis on December 20, 2007 and noted her right rotator cuff tendinitis. (R. 647.) He reviewed X-rays of Curtis's right shoulder and saw some mild acromioclavicular joint arthritis. (*Id.*) He felt Curtis was a candidate for right shoulder surgery since more conservative treatment options did not seem to be helping. (*Id.*) On February 1, 2008, he performed a right shoulder arthroscropic subacromial decompression and surgical debridement of labral fraying. (Pl.'s PFF ¶ 22, R. 615-16.)

20.     Dr. Cole diagnosed Curtis with right elbow medial epicondylitis, commonly known as tennis elbow, on February 8, 2008. (Pl.'s PFF ¶ 25, R. 646.) Curtis had previously received three elbow injections in an effort to alleviate her pain. (R. 646.) She received a fourth injection on March 20, 2008. (Pl.'s PFF ¶ 25, R. 352.)

21.     Dr. Cole injected Curtis's left shoulder with 9 cc of lidocaine and 40 mg of Depo-Medrol on May 15, 2008, following Curtis's continued complaints of osteoarthritic pain. (Pl.'s PFF ¶ 26, R. 355.)

22.     Dr. Cole administered an injection in Curtis's right shoulder on June 26, 2008. (Pl.'s PFF ¶ 29, R. 356.) At Curtis's August 7, 2008 follow-up visit, Dr. Cole noted that the injection "helped marginally to at least taper her symptoms somewhat," but observed lingering mild impingement signs and mild weakness at the rotator cuff secondary to discomfort. (Pl.'s PFF ¶ 31, R. 358.)

23.     Dr. Cole examined Curtis on January 1, 2009 and found tenderness consistent with persistent tennis elbow. (Pl.'s PFF ¶ 35, R. 359.) He administered a lidocaine and Depo-Medrol injection and indicated Curtis for medial epicondyle debridement surgery of the right elbow. (*Id.*)

24.     Dr. Cole performed the medial epicondyle debridement surgery on January 21, 2009. (Pl.'s PFF ¶ 36, R. 619-20.) Dr. Cole noted that Curtis was "doing well" and that her exam was "within normal limits" at her February 2, 2009 follow-up appointment. (R. 360.) He referred Curtis to Dr. Robert Katz for management of her fibromyalgia. (*Id.*)

25.     On May 5, 2009, Dr. Cole observed continued tenderness in Curtis's right shoulder and flexor mass of her right forearm. (Pl.'s PFF ¶ 44, R. 393.) Dr. Cole also noted:

> We are going to help Cindy with her Disability paperwork and convey that she is, although not totally disabled, markedly disabled and capable of likely only a sedentary type job with the ability to alternate to sit and stand. She was satisfied with this and will look for the paperwork. (R. 393.)

26.     On May 19, 2009, at Hartford's request, Dr. Cole completed a Physical Capacities Evaluation Form ("PCE"), in which he opined that Curtis could:

- sit four hours at a time for four to six hours per day;

- stand a half hour at a time for one hour per day;

- walk a half hour at a time for one hour per day;

- frequently (34-67%) reach at and below waist/desk level;

- frequently (34-67%) feel with both hands (sensing temperatures and textures);

- occasionally (1-33%) handle with both hands (gross motor gripping, holding, grasping);

- occasionally (1-33%) finger with both hands (fine motor);

- occasionally (1-33%) lift, carry, push, and pull up to twenty pounds, though never more;

- occasionally (1-33%) drive;

- occasionally (1-33%) stoop; and

- never climb, balance, kneel, crouch, crawl, or reach above the shoulder.

(Pl.'s PFF ¶ 45, R. 807-08.) Dr. Cole noted that Curtis' condition was likely to be aggravated by a cold environment, and that "[d]ue to fibromyalgia and multiple ongoing chronic inflammatory joint conditions, any work of repetitive nature [is] extremely limited." (*Id.*) Dr. Cole further stated that Curtis's status had not changed since the Functional Capacity Evaluation ("FCE") completed on August 4, 2008 (*see* "Accelerated Rehabilitation Center," Findings of Fact ¶¶ 33-35, *infra*). (R. 808.)

27. On June 4, 2009, Hartford sent Dr. Cole a letter pointing out that, although Dr. Cole indicated there had been no change in Curtis's status between the August 2008 FCE and May 2009 PCE, the functional limitations Dr. Cole identified in May 2009 were inconsistent with the limitations identified in August 2008. (Def.'s PFF ¶ 24, R. 755.) Hartford provided Dr. Cole a copy of the 2008 FCE and asked him, "Do you fully agree with the restrictions outlined in the Function and Capacity Evaluation?" (*Id.*) Dr. Cole marked an "X" next to the prompt, "Yes." (*Id.*)

7

28.     On July 13, 2009, Dr. Cole found a positive Tinel sign and decreased sensation

over Curtis's forearm from her wrist to her surgical incision. (Pl.'s PFF ¶ 50, R. 394.) He

referred Curtis to Dr. April Fetzer for an electromyogram/nerve conduction velocity

(EMG/NCV) of the upper extremities focusing on her ulnar nerve. (R. 394.) Dr. Fetzer

performed the EMG/NCV on July 21, 2009 and found mild right sensory ulnar neuropathy with

characteristics of demyelination. (Pl.'s PFF ¶ 52, R. 399.)

29.     On August 25, 2009, Dr. Cole or his physician assistant, Kyle R. Pilz, M.S., PA-

C, provided a letter to Hartford that states in relevant part:

> Cindy Curtis is an extremely pleasant 49-year-old patient of mine
> who has undergone several soft tissue operations for soft tissue
> inflammatory conditions in the right and left upper extremities.
> She also suffers from fibromyalgia and is under the care of a
> separate rheumatologist for this. Her condition is one of
> moderately debilitation (sic) in nature that is affected by all
> repetitive use activities.
>
> For these reasons, I have continued to support her petitions for
> long-term disability and feel that it is in her best interest medically
> to not be working, specifically anything of clerical (sic) or
> sedentary in nature because of the repetitive nature of the job and
> upper extremity use and that this aggravates her condition.

(Pl.'s PFF ¶ 55, R. 388.)[4]

**2. Scott Sporer, M.D.**

30.     On January 9, 2008, Dr. Scott Sporer examined Curtis at Dr. Cole's request due to

Curtis's complaints of left knee pain. (Pl.'s PFF ¶ 21, R. 348.) He noted Curtis's "decreased

cadence with a slight antalgic gait on the left side," pain to palpation along the lateral joint line,

and a slight tenderness to palpation along the medial joint line. (*Id.*) X-rays of Curtis's left knee

demonstrated severe lateral compartment degenerative arthritis with mild medial compartment

---

[4] Pilz's name appears in the signature block for this letter along with Dr. Cole's though the letter is written in the first person implying it contains Dr. Cole's opinion.

degenerative change. (*Id.*) Dr. Sporer concluded that Curtis was a good candidate for left knee replacement. (Pl.'s PFF ¶ 24, R. 348.)

31.     Dr. Sporer performed the knee replacement surgery on March 3, 2008. (Pl.'s PFF ¶ 24, R. 403-05). The surgical pathology report confirmed a diagnosis of left knee degenerative joint disease. (Pl.'s PFF ¶ 24, R. 680.)

32.     Curtis returned to Dr. Sporer's office for an annual follow-up on February 25, 2009. (R. 361.) She stated that, overall, she had been doing well, but complained of some discomfort just distal to her joint line. (*Id.*) Dr. Sporer injected 3 cc of lidocaine and 40 mg of Depo-Medrol into the area and indicated that Curtis should return in one year for a repeat evaluation, or sooner if needed. (Pl.'s PFF ¶ 40, R. 361.)

### 3. Accelerated Rehabilitation Center

33.     On August 4, 2008, Curtis participated in an FCE at Accelerated Rehabilitation Center per the recommendation of her physician, Dr. Gary Golden. (Pl.'s PFF ¶ 30, R. 629-33.) The physical therapist conducting the exam concluded that Curtis demonstrated "the physical capabilities and tolerances to function at the Light-Medium category of work (as defined by the U.S. Department of Labor)," and that she was "employable at this time." (Def.'s PFF ¶ 15, R. 629.)

34.     In reaching her conclusions, the physical therapist considered Curtis's complaints of slight tenderness on palpation over L5-S1 on the left side, minimal soft tissue mobility restriction from the left side between the T4 and T9 areas, diminished left knee tendon reflex following knee replacement surgery, and reduced lumbar range of motion. (Pl.'s PFF ¶ 30, R. 630.)

35.     The physical therapist observed that Curtis sustained sitting for 55 minutes in five

intervals without difficulty, displayed dynamic standing tolerances for 145 minutes in four

intervals without difficulty, and performed a sustained walking circuit on a treadmill at a speed

of 1.6 miles per hour for 25 continuous minutes with minimal hand support. (R. 631.) Curtis did

not objectively demonstrate difficulty with overhead, horizontal, and below-waist reaching and

she exhibited excellent manipulation and handling of medium dexterity tasks. (Def.'s PFF ¶ 16,

R. 632.) She demonstrated no difficulty with standing and stooping. (*Id.*)

### 4. Donald E. Roland, M.D.

36.     Curtis began seeing Dr. Donald E. Roland, a pain management specialist, on

January 5, 2009, complaining of fibromyalgia, myofascial pain, and chronic fatigue. (R. 791.)

37.     Dr. Roland reviewed MRIs of Curtis's lumbar, thoracic, and cervical spine on

January 9, 2009. (Pl.'s PFF ¶¶ 34, 37; Plaintiff's Exhibit E [89] ("Roland") 4-7.) The lumbar

spine MRI showed cartilage protrusions in the upper lumbar and lower thoracic spine, a probable

Tarlov cyst in the lower spinal canal, mild degenerative changes of the sacroiliac joints, and mild

diffuse disc bulges scattered throughout the lumbar spine with no significant stenosis. (Pl.'s PFF

¶ 34, Roland 4.) The thoracic spine MRI showed bone spurs at T6-T7 and a diffuse disc bulge at

T9-T10 causing mild spinal canal stenosis. (Pl.'s PFF ¶ 34, Roland 5.) The cervical spine MRI

showed broad-based disc bulges causing mild spinal stenosis at C4-6, mild narrowing of nerve

passageways, and ligamentum flavum thickening. (Pl.'s PFF ¶ 34, Roland 6.)

38.     Based on the MRI results, Dr. Roland administered three epidural steroid

injections between January 26, 2009 and March 23, 2009. (Pl.'s PFF ¶¶ 37-39, 41; R. 781-84,

787.)

39.     Dr. Roland also referred Curtis to Dr. Harel Deutsch for further evaluation. Curtis

met Dr. Deutsch on April 3, 2009. (Pl.'s PFF ¶ 42, R. 501-02.) Dr. Deutsch reviewed Curtis's

cervical, thoracic, and lumbar spine MRIs and determined the images were "generally

unremarkable," finding both the lumbar MRI and thoracic MRI to be "normal." (Def.'s PFF ¶

26, R. 501-02.) He acknowledged Curtis's tenderness in the right thoracic area, but stated, "At

this point, I do not really have a good answer to why this woman continues having thoracic

pain." (Pl.'s PFF ¶ 42, Def.'s PFF ¶ 26, R. 501-02.) He recommended that Dr. Roland perform

intercostal nerve blocks around the areas of tenderness, which Dr. Roland then administered on

April 9, 2009. (Pl.'s PFF ¶ 42-43, R. 502, 780-81.)

40.     On June 29, 2009, Curtis told Dr. Roland that despite epidural injections, trigger

point injections, acupuncture, physical therapy, and medication, the pain in her mid-back had her

"at wits end" and she was "getting desperate." (Pl.'s PFF ¶ 48, R. 496.) She expressed her

desire to undergo placement of a trial spinal cord stimulator ("SCS"). (Id.)

41.     Curtis underwent placement of the trial SCS on September 17, 2009. (Pl.'s PFF ¶

58, R. 492-93.) Curtis reported "75-80%" improvement to the pain in her mid-back and "70-

75%" improvement to the pain in her lower back with use of the SCS. (R. 494.) Dr. Roland

removed the trial SCS on September 21, 2009, and Curtis notified him that she would like to

proceed with a permanent SCS. (Pl.'s PFF ¶ 59, R. 494.)

42.     Dr. Roland implanted a permanent SCS on October 9, 2009. (Pl.'s PFF ¶ 60, R.

489-91.) At her follow-up appointment, Curtis reported that she was not receiving stimulation

from the SCS in portions of her lower back. (Pl.'s PFF ¶ 62, R. 486.) Dr. Roland concluded that

Curtis had dislodgement of the lead and that lead revision would be necessary. (Id.) Dr. Roland

proceeded with the lead revision surgery on October 23, 2009, but Curtis suffered a post-

operative wound infection and Dr. Roland removed the entire system one week later. (Pl.'s PFF ¶¶ 63-64, R. 482-85.)

43.     Dr. Roland implanted a new SCS in late January or early February of 2010. (*See* Plaintiff's Exhibit A [89] ("Pl.'s Exh. A") and Plaintiff's Exhibit B [89] ("Pl.'s Exh. B").) Curtis reported getting good stimulation from the new SCS at a February 8, 2010 follow-up appointment. (Pl.'s Exh. B.)

44.     On May 9, 2011, Curtis reported "throbbing, chronic and constant" pain in her lower and mid-back. (Roland 15.) Dr. Roland determined that Curtis's SCS was displaced again. (*Id.*) Curtis expressed interest in another lead revision procedure. (*Id.*)

45.     In June 2012, Dr. Roland determined that the lead was still dislodged. (Pl.'s PFF ¶ 81, Pl.'s Roland 29.) Curtis expressed interest in undergoing another lead revision procedure at the end of the summer. (*Id.*)

46.     In addition to the above treatment, Dr. Roland administered close to twenty injections for Curtis's recurring pain from January 18, 2010 through January 14, 2013. (Pl.'s PFF ¶¶ 69, 71, 73, 76-79, 83-85, 87; Pl.'s Exh. A; Plaintiff's Exhibit C [89], Roland 13, 17, 22-27, 37, 39-40, 45-46, 51-52.)

**5. Robert Katz, M.D.**

47.     Curtis began seeing Dr. Robert Katz, a rheumatologist, on May 5, 2009 for treatment of her fibromyalgia and myofascial syndrome. (Def.'s PFF ¶ 39.) The record before the Court contains Dr. Katz's treatment notes through October 19, 2012. (*See* R. 408-66, Plaintiff's Exhibit F [89] ("Pl.'s Exh. F").)

48.     Fibromyalgia is diagnosed when a patient has tenderness in at least 11 of 18 fixed pressure points on the body. (Def.'s PFF ¶ 43 (citing *Hawkins v. First Union Corp. Long-Term*

12

*Disability Plan*, 326 F.3d 914 (7th Cir. 2003).) Although the record before the Court does not contain evidence that Dr. Katz did pressure point testing, he consistently identified Curtis's diagnosis as "FMS," a common abbreviation for fibromyalgia. (*See* R. 408-66, Pl.'s Exh. F.)

49. Dr. Katz's medical records include questionnaires completed by Curtis in which she was asked to evaluate her pain and how the pain affects, for example, her concentration, memory, enjoyment of life, and normal work activities. (*See* R. 408-66.) Curtis's self-evaluations of these categories range anywhere from 4 to 9 on a 10-point scale, with 10 being more pain and more interference, but usually fall between 6 and 8. (*See id.*)

50. The medical records also contain some of Dr. Katz's handwritten notes. The notes are brief and often difficult to read. They seem to largely reflect Curtis's self-reports with a few intermittent objective findings. (*See* R. 408-66, Pl.'s Exh. F.) The notes reference Curtis's pain, poor concentration, fatigue, and memory loss (*see, e.g.*, R. 429, 434).

### 6. Michael Ziffra, M.D.

51. Dr. Michael Ziffra was Curtis's treating psychiatrist with whom she met monthly from January 2008 through at least June 2010. (R. 315-44, Curtis SSA 362-82.) Dr. Ziffra diagnosed Curtis with major depressive disorder, panic disorder, and other pain disorders. (*See id.*) He frequently remarked that Curtis's pain likely contributed to her psychological symptoms. (*See, e.g.*, R. 327, 335.)

52. At her first visit, Dr. Ziffra noted that Curtis's previously prescribed medications included Cymbalta, Effexor, and Ativan, as well as a host of other medications to treat her physical symptoms, including Synthroid, Duragesic, Norco, Lyrica, Flexeril, and Fosamax. (R. 316.) He cross-tapered Curtis off the Cymbalta, increased the Effexor dosage, and continued with the Ativan. (R. 318.) He prescribed Lamictal in October 2008. (R. 337.) Curtis continued

taking Effexor, Ativan, and Lamictal in varying doses through at least June 2010. (R. 315-44, Curtis SSA 362-82.)

53.     Dr. Ziffra noted that Curtis's cognition was "grossly intact" through April 2009. (Def.'s PFF ¶ 53, R. 315-44, Curtis SSA 378-82.)

54.     On July 14, 2010, Dr. Ziffra completed an evaluation for the Social Security Administration in which he wrote that Curtis was unable to work "due to both psychiatric and physical symptoms." (Curtis SSA 399-402.) He wrote that Curtis's "current episode started around 2007" and that she "remains symptomatic." (*Id.*)

55.     In his written report dated July 14, 2010, Dr. Ziffra referred to and relied upon the May 2009 neuropsychological examination by Frank Leavitt, Ph.D. (*see* Frank Leavitt, Ph.D., Findings of Fact ¶¶ 56-60, *infra*) cited as "previous neuropsychological testing that showed significant problems with memory and other cognitive domains." (*Id.*) He stated that Curtis's "problems with low energy and cognition make it difficult to start and complete tasks" and noted that Curtis had "many other physical/medical problems . . . which also have a significant impact on her ability to work." (*Id.*) He found it "difficult to [definitively] say how much of her inability to work is due to psychiatric problems, vs. how much is due to her physical problems." (*Id.*)

**7. Frank Leavitt, Ph.D.**

56.     Dr. Frank Leavitt performed a cognitive examination on May 28, 2009 in order to evaluate Curtis's suspected "fibrofog." (Pl.'s PFF ¶ 46, R. 467-70.) Curtis told Dr. Leavitt she believed her cognitive problems had "significantly increased" in the three or four years prior to the examination. (R. 467.) Her forgetfulness was endorsed "at a rate that is considerably higher than other individuals her age." (*Id.*)

57. Curtis performed in the normal/average range on simple attention and concentration, global processing speed, reading speed index, memory under conditions of focused attention, and general speed of self-paced mental operations. (R. 467-70.) Her primary encoding and retrieval mechanisms were intact, and her mental confusion was in the low end of the range found among fibromyalgia patients reporting cognitive difficulties. (*Id.*)

58. Dr. Leavitt identified four deficiencies:

- Curtis performed "more than three standard deviations below the mean" when asked to split attention between relevant and distracting information. Dr. Leavitt observed a "highly abnormal" rate of forgetting when Curtis was faced with two or more stimulus sources competing for attention.

- Curtis had "a serious breakdown" in the ability to process externally-paced, heavy information loads. Dr. Leavitt noted that rapid processing of externally-paced information loads relies on working memory and executive control, and that the most general property of executive function is efficient problem solving.

- Curtis performed poorly on visual-motor tracking and set shifting tasks, suggesting weakness in sequencing and reduced flexibility in switching between rehearsed response modes.

- Curtis had selective deficits in naming speed.

(Pl.'s PFF ¶ 46, R. 467-70.)

59. Dr. Leavitt concluded that Curtis's deficiencies were "significant and appreciably greater than expected with normal aging" and would "interfere with her ability to work as a nurse." (Pl.'s PFF ¶ 46, R. 469.)

60.     Dr. Leavitt performed a follow-up examination on December 16, 2010.

(Plaintiff's Exhibit D [89] ("Pl.'s Exh. D") at 1.)  He compared Curtis's 2009 test scores with her

2010 test scores and found no change in functioning on seven scales, gains on one scale, and a

decrease of a half standard deviation or more on five scales.  (Pl.'s PFF ¶ 72, Pl.'s Exh. D at 2-3.)

He further noted that Curtis's mental confusion was high.  (Pl.'s Exh. D at 2.)  He concluded,

"The overall pattern of change is in an unfavorable direction."  (Pl.'s PFF ¶ 72, Pl.'s Exh. D at

3.)

### 8. Hartford's Reviewing Physicians

#### a. Steven Lobel, M.D.

61.     Hartford retained Dr. Steven Lobel, a board certified physician in physical

medicine and rehabilitation, to provide an opinion on Curtis's medical status and functional

capabilities.  (Def.'s PFF ¶ 46-47, R. 278-83.)  Dr. Lobel's opinions appear in a report he issued

to Hartford in or around February 2010.

62.     Dr. Lobel did not examine Curtis.  Instead, he conducted a file review of Curtis's

medical records and concluded that she could:

- sit for two hours at a time, six to eight hours per day, with a fifteen minute
  break after sitting for two hours;

- stand and walk a combined thirty minutes at a time, up to two hours per day;

- finger, grasp, and manipulate without limitation;

- frequently reach to waist level;

- occasionally reach below waist level;

- occasionally reach overhead while sitting;

- occasionally climb one to two flights of stairs;

- occasionally lift and carry up to ten pounds;

- occasionally bend, twist, and stoop;

- occasionally push and pull up to twenty pounds; and

- never crawl, climb, squat, or kneel.

(*Id.*)

63.    Dr. Lobel found it "essential to parse out the pain from [fibromyalgia] in assessing [Curtis's] functional impairments." (R. 281.)

64.    Dr. Lobel further stated that fibromyalgia "does not cause disability." (*Id.*)

65.    Accordingly, Dr. Lobel based his findings "solely on [Curtis's] orthopedic and spinal functional impairments and . . . the results of the [August 2008] FCE." (*Id.*)

### b. James English, Ph.D.

66.    Hartford retained Dr. James English, a board certified psychologist, to provide an opinion on Curtis's psychological symptoms and cognitive functioning. (Def.'s PFF ¶ 49, R. 269-73.) Dr. English's opinions appear in a report he issued to Hartford in or around February 2010.

67.    Dr. English did not examine Curtis. Instead, he reviewed the August 2008 FCE and records from Drs. Leavitt, Ziffra, Cole, Sporer, Roland, and Deutsch. (R. 270.)

68.    Dr. English spoke with Dr. Ziffra on February 22, 2010. (Def.'s PFF ¶ 51, R. 270.) Dr. English's report notes that Dr. Ziffra stated a return to work as an operating room nurse was unlikely. (Def.'s PFF ¶ 57, R. 270.)

69.    Dr. English spoke with Elizabeth Palmer-Tolley, Curtis's therapist, on February 22, 2010.[5] (Def.'s PFF ¶ 58, R. 270-71.) According to Dr. English's report, Palmer-Tolley

---

[5] Palmer-Tolley's treatment notes were not part of the record before the Court.

observed no serious impairment or limitations in Curtis's cognition, though she also doubted whether anyone could accurately assess Curtis's cognition given the number of prescription medications Curtis was taking. (R. 270-71.)

70.     Dr. English concluded that Curtis did not have any significant psychological and/or cognitive impairments. (Def.'s PFF ¶ 60, R. 272.)

### E. Hartford's Vocational Expert Reports

71.     Hartford retained Jessie Hennessy, M.S., a vocational rehabilitation counselor, who conducted a series of Employability Analysis Reports ("EAR") to determine Curtis's employability. (R. 293-99, 534-48, 696-714.)

72.     Hennessy used the Occupational Access System ("OASYS"), "a computerized job matching system that cross references an individual's qualifications profile with 12,741 occupations classified by the U.S. Department of Labor in the 1991 Dictionary of Occupational Titles (DOT)," to conduct the EARs. (*Id.*)

73.     The OASYS system identifies occupations with "closest," "good," "fair," and "potential" transferability levels to a person's qualifications profile. "Closest" occupations indicate "excellent" transferability, requiring "minimum" additional training for "familiarization only." "Good" occupations indicate "good to moderate" transferability, requiring "some" additional training in tools or materials. "Fair" occupations indicate "fair" transferability requiring development of a "plan" in which to train a person for the additional skills required to perform the identified occupation. "Potential" occupations indicate "low" transferability requiring "plan development and training." (R. 299, 539, 706.)

74.     The DOT lists a Specific Vocational Preparation ("SVP") for each described occupation. (Plaintiff's Response Brief [90] ("Pl.'s Resp.") at 31, fn. 64.) The Court takes

judicial notice that SVP is defined as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." *Dictionary of Occupational Titles*, Appendix C, available at http://www.occupationalinfo.org/appendixc_1.html. The SVP scale ranges from 1 ("short demonstration only") to 9 ("over 10 years"). (*Id.*) The levels of the scale are mutually exclusive and do not overlap. (*Id.*)

### a. July 8, 2009 EAR

75.    Hennessy completed the first EAR on July 8, 2009 ("EAR 1"). (R. 696-714.) She based Curtis's qualifications profile on Curtis's "functional capabilities, education, training and work history." (R. 696.) She derived Curtis's functional capabilities from the August 2008 FCE. (*Id.*)

76.    Hennessy identified two occupations in the DOT within the "closest" level, no occupations within the "good" level, five occupations within the "fair" level, and 12 occupations within the "potential" level that Curtis would be able to perform and that met her income threshold. (R. 697.) Hennessy eliminated the "fair" and "potential" occupations with an SVP higher than 3 (requiring "over 1 month up to and including 3 months" of training), as they would require Curtis to have "additional training or experience." (*Id.*) She listed "Nurse, Office" and "Nurse, Staff, Occupational Health Nursing" as a representative sample of occupations in the DOT that met Curtis's profile. (*Id.*)

77.    Hennessy also completed a job-person match using the Occupational Outlook Handbook and concluded Curtis would be able to perform additional jobs, including Medical Case Manager, Nurse Consultant, Nurse Administrator, Nurse Educator, Care Coordinator Nurse, and Nursing Care Facility Nurse. (R. 697-98.)

### b. July 27, 2009 EAR

78.     Hennessy completed an addendum to EAR 1 on July 27, 2009 ("EAR 2"). (R.
534-48.) Hartford requested EAR 2 in light of Dr. Leavitt's May 28, 2009 examination
concluding Curtis's cognitive impairments would interfere with her ability to work as a nurse.
(R. 534.) Specifically, Hartford asked Hennessy to review the results of Dr. Leavitt's cognitive
examination and "determine if the updated information changes the result of [EAR 1]." (*Id.*)

79.     Hennessy updated Curtis's qualifications profile to reflect the findings of both the
August 2008 FCE as well as Dr. Leavitt's report. (*Id.*) Specifically, Hennessy updated Curtis's
profile to account for her difficulty splitting attention between relevant and distracting
information, her weakness in sequencing, and her reduced flexibility between rehearsed response
modes. (*Id.*) As a result, "performing a variety of duties" was switched from "yes" on EAR 1 to
"no" on EAR 2, "following specific instructions and performing repetitive work" was set to
"yes" on EAR 2 in order to accommodate Curtis's difficulty in splitting attention, and "attaining
precise limits/tolerances" was switched from "yes" on EAR 1 to "no" on EAR 2 due to Curtis's
marked weakness in sequencing. (*Id.*)

80.     With these changes, Hennessy was unable to identify any occupations in the DOT
within the "closest" or "good" levels that Curtis would be able to perform and that met her
income threshold. (*Id.*)

81.     Hennessy identified four occupations within the "fair" level and four occupations
within the "potential" level that met Curtis's profile. (*Id.*) She listed "Police Officer, Booking,"
"Deputy Sheriff, Building Guard," and "Deputy Sheriff, Civil Division" as a representative
sample of matching occupations. (R. 534-35.)

82.     Unlike in EAR 1, Hennessy did not eliminate the "fair" and "potential" jobs with an SVP higher than 3 in EAR 2.  Instead, she noted that "Police Officer, Booking" has an SVP of 4.  (R. 535.)  "Deputy Sheriff, Building Guard" and "Deputy Sheriff, Civil Division" have an SVP of 3.  (R. 539.)

83.     Hennessy did not mention the Occupational Outlook Handbook in EAR 2 and did not identify any other jobs Curtis would be able to perform.

### c.  March 17, 2010 EAR

84.     At Hartford's request, Hennessy conducted a third EAR on March 17, 2010 ("EAR 3") in order to determine if the medical information provided by Dr. Lobel on March 1, 2010 "changes the result of [EAR 1]."  (R. 293-99.)

85.     Hennessy based Curtis's qualifications profile solely on Dr. Lobel's March 1, 2010 medical report.  (R. 293.)  She did not incorporate the functional capacity changes made in EAR 2, accounting for Curtis's cognitive limitations.  Rather, she set every change made in EAR 2 back to its original EAR 1 setting.  (*See* R. 296-98.)

86.     Based solely on Dr. Lobel's functional capacity findings, Hennessy identified two occupations in the DOT within the "closest" level, no occupations within the "good" level, four occupations within the "fair" level, and ten occupations within the "potential" level that Curtis would be able to perform and that met her income threshold.  (R. 293.)  Hennessy again eliminated the "fair" and "potential" occupations with an SVP higher than 3 because they would require additional training.  (*Id.*)  Based on those findings, Hennessy stated that "both the viable employment matches from [EAR 1] are still valid," and accordingly, listed "Nurse, Office" and "Nurse, Staff, Occupational Health Nursing" as occupations in the DOT that met Curtis's profile. (*Id.*)

21

87.     Hennessy also determined that the results of the Occupational Outlook Handbook job-person match in EAR 1 were still valid. (R. 293-94.) Based upon that analysis, she stated Curtis would be able to work as a Medical Case Manager, Nurse Consultant, Nurse Administrator, Nurse Educator, Care Coordinator Nurse, and Nursing Care Facility Nurse. (R. 294.)

**F. Curtis's Social Security Disability Claim**

88.     In addition to seeking LTD benefits under the Plan, Curtis also filed two applications for disability benefits under the Social Security Act.

89.     Curtis filed her first application in 2007, claiming she became disabled on January 30, 2007. (*See* R. 901.) The Social Security Administration ("SSA") initially denied Curtis's application on December 6, 2007, and again upon reconsideration on April 23, 2008. (Def.'s PFF ¶¶ 18, 21; R. 894, 925.) On January 20, 2010, however, the SSA approved Curtis for a closed period of disability and awarded retroactive benefits for January 2007 through July 2008. (Curtis SSA 59.)

90.     Curtis then filed an additional application for Social Security disability benefits on May 19, 2010. This submission stated she first became disabled as of her 50th birthday on May 4, 2010. (Curtis SSA 59.) The SSA denied Curtis's second application at the initial and reconsideration levels before issuing a fully favorable opinion on April 4, 2011, following review of her case by an administrative law judge ("ALJ"). (Plaintiff's Exhibit G [89] at 3-11.)

91.     The ALJ considered Curtis's age, education, work experience, and residual functional capacity and concluded that Curtis first became disabled under the Social Security Act on May 4, 2010. (*Id.* at 8.)

92.     The ALJ found that Curtis had the residual functional capacity to perform "sedentary" work, as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), with occasional crouching, crawling, bending, stooping, kneeling, balancing, and reaching. (*Id.*)

93.     The ALJ further found that, due to "significant limitations resulting from her mental impairments," Curtis was further limited to "unskilled work" and "simple, routine, and repetitive tasks." (*Id.* at 8-9.) In reaching this conclusion, the ALJ relied heavily on Dr. Ziffra's July 14, 2010 report. (*Id.*)

94.     The ALJ further found that Curtis "was an individual closely approaching advanced age" per 20 C.F.R. §§ 404.1563 and 416.963 and that Medical-Vocational Rule 201.14 directed a finding of "disabled" under the Social Security Act. (*Id.* at 10-11.)

## CONCLUSIONS OF LAW

### I.     Standard of Review

Curtis seeks to recover employee benefits under ERISA, 29 U.S.C. § 1001 *et seq.* Section 1132(a)(1)(B) of ERISA permits a person denied benefits under an employee benefit plan to challenge that denial in federal court. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008). As the party seeking to enforce benefits under the Plan, Curtis bears the burden of proving that she is entitled to benefits by a preponderance of the evidence. *See Ruttenberg v. U.S. Life Ins. Co.*, 413 F.3d 652, 663 (7th Cir. 2005).

The denial of Curtis' application for benefits will be reviewed *de novo* per the Court's prior rulings in this case [DE##66, 74]. Under the *de novo* standard of review, the question is not whether Hartford gave Curtis a full and fair hearing at the administrative level. Rather, the Court must decide the ultimate question of whether Curtis is entitled to the benefits she seeks under the Plan. *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643 (7th Cir. 2007). In doing

so, the Court must come to an independent decision on both the legal and factual issues that form the basis of the claim. *Id.* Anything that happened before the Plan administrator is therefore "irrelevant," *id.*, and the Court has permitted Curtis to introduce additional evidence that was not submitted during the administrative proceedings. *See Casey v. Uddenholm Corp.*, 32 F.3d 1094, 1099 (7th Cir. 1994) ("[T]he district court . . . may permit the introduction of additional evidence necessary to enable it to make an informed and independent judgment."); *see also Krolnik v. Prudential Ins. Co. of Am.*, 570 F.3d 841, 843 (7th Cir. 2009) ("[W]e cannot imagine any justification for refusing to admit evidence that one party has procured at its own expense.").

The Court applies federal common law rules of contract interpretation to construe the terms of the Plan. *Diaz*, 499 F.3d at 643. Under those rules, the Court "interpret[s] the terms of the policy in an ordinary and popular sense, as would a person of average intelligence and experience, and construe[s] all plan ambiguities in favor of the insured." *Id.* at 644 (quoting *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997) (quotations omitted)).

## II. The Determinative Date

In order to prevail, Curtis must prove by a preponderance of the evidence that as of August 6, 2009, she satisfied the Plan's "any occupation" definition of disability. In other words, Curtis must prove that as of August 6, 2009, she was unable to perform any occupation for which she was qualified by her education, training, or experience with a minimum monthly earnings threshold of $4,100.38. If not, then she is not entitled to benefits and, hence, no longer covered under the Plan. *See* R. 20-21 (Plan's coverage terminates when an employee is no longer employed full-time or no longer entitled to benefits).

Accordingly, August 6, 2009 is the determinative date. If Curtis became disabled to the point of not being able to work at "any occupation" within the meaning of the Plan thereafter,

she would have no claim for benefits because she had already ceased being a Plan participant. The Court has considered evidence of Curtis's continued treatment from several physicians after August 6, 2009 (as detailed in the Findings of Fact) for the purpose of determining whether that evidence is probative of Curtis's condition prior to the determinative date.

### III. The combined effect of Curtis's physical and cognitive impairments precludes her from being able to perform any occupation.

The Court finds that the total combination of Curtis's impairments caused her to be disabled from any occupation as of August 6, 2009, even if none of her impairments in isolation necessarily compel a finding in her favor. *See Nickola v. Group Life Assurance Co.*, No. 03 C 8559, 2005 WL 1910905 at *7 (N.D. Ill. Aug. 5, 2005) ("Precedent teaches that . . . a disability determination must make a reasoned assessment of whether the total combination of claimant's impairments justify a disability finding, even if no single impairment standing alone would warrant the conclusion."). Curtis suffered multiple physical impairments that caused chronic pain and significantly limited her functional capacity, to the point that her treating physician opined she would be unable to perform more than sedentary, non-repetitive work. Her cognitive limitations further limited her functional capacity, reducing her to simple, repetitive tasks. The combined effect of these impairments precluded Curtis from being able to perform any occupation meeting her minimum income threshold. Even Hartford's vocational expert ("VE") could not identify any occupations Curtis would be able to perform without additional training when accounting for the combined effect of her physical and cognitive impairments.

Hartford argues that no medical expert or VE ever explicitly stated that Curtis was unable to perform any occupation, so Curtis has not met her burden of proof. Hartford misstates the scope of the inquiry, however. The Court must consider the combined effect of Curtis's physical impairments, cognitive impairments, and ability to perform "any occupation" as defined by the

Plan in making its disability determination, so whether or not one particular doctor explicitly stated Curtis was "disabled from any occupation" is not dispositive. *See id.* In other words, it is the Court's job to determine whether Curtis is unable to perform any occupation within the meaning of the Plan based on all the evidence in the record. *Diaz*, 499 F.3d at 643. Even if Curtis had submitted a physician's opinion that she was unable to perform any occupation, the Court would be obligated to determine whether the evidence in the record supported that opinion and not simply to accept it on its face.

None of Hartford's medical experts considered the combined effect of Curtis's physical and cognitive impairments as of the determination date. In fact, one of Hartford's experts, Dr. Lobel, felt it was essential to parse out Curtis's consistent reports of pain secondary to fibromyalgia in determining her functional capacity. When Hartford's VE considered Curtis's physical *and* cognitive impairments, the only jobs the expert determined Curtis could do required her to undergo substantial training. Based on its review of all the evidence in the record, the Court concludes that Curtis has met her burden of proving by a preponderance of the evidence that, as of August 9, 2009, she was unable to work in any occupation defined by the Plan as an occupation for which Curtis was "qualified by education, training or experience" (Finding of Fact ("FF" ¶ 7) that satisfied the Plan earnings threshold.

### A. Curtis suffered multiple physical impairments that resulted in significant functional limitations.

The record before the Court establishes that Curtis suffered multiple physical impairments that caused chronic pain, which reduced her functional capacity and significantly limited her ability to work.

Prior to the determinative date, Curtis consistently reported debilitating pain that affected her ability to sleep, concentrate, and perform daily activities to all of her treating physicians.

Indeed, she reported pain so severe in June 2009 that it was making her "desperate" and pushing her to her "wits end." FF ¶ 40. Curtis's course of treatment substantiates her subjective complaints. She received prescriptions for potent narcotic medications, including Duragesic and Norco. (FF ¶¶ 52.) She underwent multiple orthopedic surgeries on her knee, shoulders, and elbow. (FF ¶¶ 18-19, 24, 31.) She received dozens of pain injections and nerve blocks throughout her body from Drs. Cole, Sporer, and Roland. (FF ¶¶ 20-23, 32, 38-39.)

When surgery and drugs did not relieve her pain, Curtis opted to undergo placement of a spinal cord stimulator no less than three times in an effort to curb her symptoms. (FF ¶¶ 41-43.) Curtis first had an SCS procedure done in September 2009 to implant a trial SCS but she expressed to Dr. Roland a desire to undergo that procedure at the end of June 2009. (FF ¶¶ 40, 41.) She underwent another procedure in October 2009 to implant a permanent SCS. (FF ¶ 42.) When the permanent SCS became dislodged, Curtis underwent yet another procedure to correct the problem. (*Id.*) A post-operative wound infection forced another procedure to remove the device entirely. And, despite these complications, Curtis still chose to undergo another implantation procedure a few months later to try the SCS again, thus supporting her assertion that she was, in fact, "desperate" to manage her symptoms. (FF ¶ 43.) In addition to the SCS procedures, Curtis received close to twenty injections for pain from January 2010 through January 2013. (FF ¶ 46.) *See Diaz*, 499 F.3d at 646 (noting it highly improbable that a disability claimant would undergo extensive pain treatment procedures, including narcotic drugs and implantation of a spinal cord stimulator, "merely in order to strengthen the credibility of her complaints of pain and so increase her chances of obtaining disability benefits") (citing *Carradine v. Barnhart*, 360 F. 3d 751, 755 (7th Cir. 2004)).

Although the SCS implantations and some of Curtis's injections occurred after the

August 6, 2009 determinative date, they were a continuation of consistent treatment that Curtis

was undergoing before and at her determinative date designed to address her disabling pain.

Curtis began seeing Dr. Roland, a pain management specialist in January 2009. (FF ¶ 36.) He

administered multiple injections to relieve her pain before and after the determinative date. (FF

¶¶ 38, 46.) Curtis underwent the SCS treatments beginning in September 2009, a month after the

determinative date, following her complaints to Dr. Roland of non-stop, intolerable pain in late

June 2009, and her stated desire at that time to undergo placement of an SCS. (FF ¶ 40.) Taken

as a whole, Curtis's medical history demonstrates the kind of "long history of treatment" this

Circuit finds suggestive of a disability as of the determinative date. *See Diaz*, 499 F.3d at 646

(citing *Carradine*, 360 F. 3d at 755).

In addition to the medical records substantiating Curtis's debilitating pain, Dr. Cole

provided direct assessments of how Curtis's physical impairments affected her ability to work.

Although there is no rule conferring special weight on an ERISA claimant's treating physicians,

*Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003), Curtis had a longstanding

relationship with Dr. Cole and he was well-versed in her various ailments. As such, his opinion

is particularly relevant. And, significantly, he wrote three separate letters to Hartford expressing

his support for Curtis's disability claim.

First, on May 5, 2009, Dr. Cole said Curtis was "markedly disabled" and capable of

"likely only a sedentary type job." (FF ¶ 25.) Then, on May 19, 2009, Dr. Cole completed a

PCE which effectively ruled out even most sedentary work. Social Security Ruling 83-10 states

that "sedentary" work generally involves sitting for at least six hours during an eight-hour

workday, with periods of walking and standing accounting for the remainder. *See Halpin v .W.*

*W. Grainger, Inc.*, 962 F.2d 685, 695 n. 11 (7th Cir. 1992) ("Although the standards used in adjudicating social security cases are not applicable under ERISA, the guiding principles developed in those cases may be 'instructive' in ERISA cases."). Dr. Cole limited Curtis to sitting for just four hours at a time for four to six hours per day and to standing and walking for no more than an hour. (FF ¶ 26.) Thus, according to Dr. Cole, even at her absolute best, Curtis would struggle to complete an eight-hour workday. Moreover, SSR 83-10 emphasizes that "most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger action." Yet Dr. Cole stated that Curtis's ability to perform repetitive work was "extremely limited" due to her impairments, thereby further disqualifying Curtis from most sedentary occupations. (FF ¶ 26.)

Finally, on August 25, 2009, Dr. Cole told Hartford that he "continued to support" Curtis's disability claims because he believed it was in her best interest not to work at all. Dr. Cole reiterated that, at the very least, she should not be doing anything that involved "repetitive use activities" because "upper extremity use . . . aggravates her condition." (FF ¶ 29.) Thus, though Dr. Cole never explicitly said Curtis was "disabled from any occupation," his treatment notes and multiple letters in support of her disability claim establish that Curtis had extensive physical limitations which interfered with her ability to perform most jobs.

Hartford contends that Dr. Cole's PCE restrictions are "wholly consistent" with the functional limitations found by its reviewing physician, Dr. Lobel, and that Dr. Lobel's findings establish Curtis is employable. (Defendant's Brief [87] ("Def.'s Br.") at 24.) This argument fails for several reasons. First, Dr. Lobel's functional capacity limitations differ materially from Dr. Cole's. For example, whereas Dr. Cole suggested Curtis would struggle with completing an eight-hour workday, Dr. Lobel, who never actually examined Curtis, found she could easily do

so, noting she could sit for eight hours, stand for two hours, and walk for two hours. (FF ¶ 62.) In addition, Dr. Cole limited Curtis to only occasional (1-33%) gripping, holding, grasping, and fingering, yet Dr. Lobel found Curtis could finger, grasp, and manipulate "without limitation." (FF ¶¶ 26, 62.) And, significantly, Dr. Lobel in no way restricted Curtis's ability to perform repetitive work. Dr. Lobel's significantly different assessment of Curtis's functional capacity would allow Curtis to perform an entire category of work that Dr. Cole excluded. Accordingly, Hartford's argument that Dr. Cole's and Dr. Lobel's assessments of Curtis's functional capacity are perfectly consistent does not withstand close analysis.

Dr. Lobel's opinion also is of diminished persuasive value because he outright rejected fibromyalgia as a disabling condition and expressly "parse[d] out" Curtis's pain in evaluating her functional capacity, despite never examining her. (FF ¶ 63.) The Plan contains no restriction against fibromyalgia and this Circuit has consistently recognized it as a potentially disabling condition. *See, e.g., Hawkins*, 326 F.3d at 919 (noting although the majority of individuals with fibromyalgia can work, that is "the weakest possible evidence" that everyone with that condition can work). Dr. Lobel's report erroneously failed to account for a significant portion of Curtis's pain and cannot be deemed reliable or persuasive.

Nevertheless, Hartford asserts that Kyle Pilz, Dr. Cole's physician assistant, "agreed with" Dr. Lobel's findings. (Def.'s PFF ¶ 48.) Hartford supports this assertion with a hearsay statement attributed to Pilz in Dr. Lobel's report. Dr. Lobel wrote:

> 02/22/2010 at 10:00; discussion with Kyle, Dr. Cole's PA-C. He feels claimant has significant pathology limiting full return to work. He agrees with restrictions and limitations as reviewed and provided below. He feels claimant could return to full time work with these restrictions and limitations. He reports there is no malingering, but claimant with multiple complaints and diagnoses as limiting her functional abilities.

(R. 280.) Curtis objects that this is an inadmissible hearsay statement (Pl.'s Resp. at 16), and Hartford presents no argument that the statement fits within any exception to the hearsay rule. The Court agrees with Curtis. Pilz's statement is inadmissible hearsay. Fed. R. Evid. 802.

Even if it were admissible, Dr. Lobel's characterization of his conversation with Pilz does not bear the weight Hartford attributes to it. Hartford emphasizes Dr. Lobel's assertion that Pilz "agrees with restrictions and limitations as provided below" and that Curtis "could return to full time work with these restrictions and limitations." But Hartford neglects to mention that these comments are sandwiched between Pilz's reported remarks that Curtis had "significant pathology limiting full return to work" and that "multiple complaints and diagnoses [limited] her functional abilities." It also is unclear what Dr. Lobel meant by the "restrictions and limitations as provided below." Did Dr. Lobel read those restrictions and limitations to Pilz in soliciting his opinion concerning Curtis's capacity for work? Did he paraphrase or characterize them? Did he ask Pilz whether he agreed with Dr. Cole's May 19, 2009 PCE which differed from Dr. Lobel's assessment of Curtis's functional capacity? Taken as a whole, Dr. Lobel's characterization of Pilz's statement is too vague and ambiguous to mean much of anything.

Moreover, as noted above, Dr. Lobel's findings differ materially from Dr. Cole's. It is difficult to imagine that Pilz would agree completely with the restrictions noted by Dr. Lobel, who did not even examine Curtis, rather than the restrictions found by Dr. Cole, the physician for whom Pilz worked and Curtis's longtime treating physician. The hearsay statements Dr. Lobel attributes to Pilz also contradict the opinion expressed by Dr. Cole in his letter of August 25, 2009, on which Pilz's name also appears. (FF ¶ 68.) The evidentiary rule against the admission of hearsay statements exists for a reason. The Court, therefore, rejects Hartford's attempt to buttress Dr. Lobel's opinion with Pilz's hearsay statement.

Although Dr. Lobel may have relied on Pilz's statement as part of the basis of his expert opinion pursuant to Rule 703 of the Federal Rules of Evidence, the statement itself would still be inadmissible. Otherwise inadmissible evidence cannot be admitted under Rule 703 unless its probative value in helping the finder of fact evaluate the expert opinion substantially outweighs its prejudicial effect. Fed. R. Evid. 703. Rule 703 "was not intended to abolish the hearsay rule and to allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witness on whose statements or opinions the expert purports to base his opinion." *Loeffel Steel Prod., Inc. v. Delta Brands, Inc.*, 387 F.Supp.2d 794, 808 (N.D. Ill. 2005).

Hartford also argues that Dr. Cole's statement in 2009 that he agreed with the August 2008 FCE from the Accelerated Rehabilitation Center physical therapist establishes that Curtis is employable. (Def.'s Br. at 24.) It is difficult to say what Dr. Cole meant when he put an "X" next to the prompt "Yes" in the form Hartford sent to him, seeming to indicate that he agreed with the August 2008 FCE even though that FCE was not consistent with Dr. Cole's evaluation of Curtis in May 2009. The August 2008 FCE, which was done by a physical therapist and not by Dr. Cole or anyone in his office, concluded Curtis was capable of light to medium level work (FF ¶ 33) and Dr. Cole's May 2009 PCE would preclude even most sedentary jobs. Dr. Cole's aberrational check mark without any elaboration or explanation is so inconsistent with the rest of his medical records and detailed reports that it simply does not tip the balance on a preponderance of the evidence standard. *See Glenn v. MetLife*, 461 F.3d 660, 669 (6th Cir. 2006) (finding that a single check-mark on an insurer's form that was inconsistent with three years of medical records and reports "can best be described as aberrational"), *aff'd, Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008).

Hartford next argues that Dr. Cole's statements do not support a finding of disability under the "any occupation" standard because Dr. Cole never explicitly stated Curtis was totally disabled. (Def.'s Br. at 22-26.) Hartford contends, among other things, that Dr. Cole's June 2009 PCE "affirmed [Curtis's] ability to work, at least in a sedentary occupation." (*Id.*) Moreover, Hartford points out, Dr. Cole did not conclude that Curtis was unable to work, but rather that it was in her "best interest medically" not to work. (*Id.*)

As noted above, the Court has considered all of Curtis's impairments in combination in reaching its disability determination. Accordingly, the fact that Dr. Cole never explicitly stated Curtis was disabled from any occupation is not dispositive. In fact, as noted above, it is the Court's job to make that ultimate determination, not Dr. Cole's. *Diaz*, 499 F.3d at 643. The critical point is that Curtis's extensive medical treatment with Dr. Cole and other medical treaters confirm that her pain and resulting physical limitations were significantly disabling as of the determinative date. *See Diaz*, 499 F.3d at 646 (finding persuasive "the improbability that [plaintiff] is a good enough actress to fool a host of doctors . . . into thinking she suffers extreme pain; and the (perhaps lesser) improbability that this host of medical workers would prescribe drugs and other treatment for her if they though she were faking her symptoms") (citing *Carradine*, 360 F. 3d at 755). As discussed above, Curtis underwent extensive, invasive, and painful treatment for her pain, including multiple injections and surgeries. It does not make sense that someone not in significant pain would do so. None of the physicians or medical providers who saw Curtis over an extended time period thought she was a malingerer or that she was faking her symptoms.

Hartford's remaining argument is that Dr. Cole's "objectivity is suspect" and his "office notes make clear that he was attempting to lend as much support to Curtis's claim that he could."

(Def.'s Br. at 27.) But Hartford wants to have it both ways. Hartford first argues that Dr. Cole's notes and opinions are too weak to establish Curtis is disabled. If that argument fails, however, Hartford contends that Dr. Cole's overly favorable opinion should be disregarded because he was willing to say whatever was necessary for Curtis's disability claim to be approved. This "heads I win, tails you lose" argument is not convincing. Moreover, Hartford cannot demand that a disability claimant must provide a medical opinion explicitly stating she is "disabled from any occupation" and then accuse the claimant's doctor of tailoring his words to do just that in support of his patient's claim.

In any event, the Court does not view Dr. Cole's "support" of Curtis's disability claim as negatively as does Hartford. Had Dr. Cole truly been biased, as Hartford contends, he easily could have written that Curtis was "disabled from any occupation" and left it at that. The fact that Dr. Cole's opinions and notes are more nuanced demonstrates rather than undermines his credibility. Further, Dr. Cole's ultimate assessment that Curtis's ability to work is very limited is supported fully by the rest of the record.

**B. Curtis's cognitive limitations limited her functional capacity.**

The record establishes that Curtis suffered cognitive limitations that severely impacted her ability to work. In May 2009, Dr. Leavitt identified four cognitive deficiencies that were "significant and appreciably greater than expected with normal aging." (FF ¶ 59.) For example, Dr. Leavitt found that Curtis struggled considerably with splitting attention between relevant and distracting information. (FF ¶ 58.) Curtis performed more than three standard deviations below the mean on that measure, with a "highly abnormal" rate of forgetting when faced with two or more stimulus sources competing for attention. (*Id.*) Additionally, Curtis had a "serious breakdown" in her ability to process externally-paced information loads, indicating deficiencies

in working memory and executive control. (*Id.*) Dr. Leavitt also pointed out that executive control is necessary for efficient problem solving, *id.*, so it follows that Curtis's problem solving skills were also impaired. Dr. Leavitt further found that Curtis performed poorly on visual-motor tracking and set shifting tasks, which suggested that she would have difficulty switching between rehearsed response modes. (*Id.*)

Dr. Leavitt's overall findings paint a picture of a person who cannot sustain concentration, cannot differentiate between relevant and irrelevant information, cannot engage in problem solving tasks, and cannot perform a variety of duties. While Dr. Leavitt specified that Curtis's deficiencies would "interfere with her ability to work as a nurse," (FF ¶ 59), common sense says that her deficiencies would interfere with her ability to perform other jobs as well. As discussed below, Hartford's own VE confirmed this conclusion in light of Dr. Leavitt's findings.

Still, Hartford argues that Curtis has not met her burden because no doctor ever explicitly said Curtis's physical and cognitive impairments prevent her from working any occupation. (Defendant's Response Brief [91] at 15.) The Court reiterates that this is not dispositive. *Nickola*, 2005 WL 1910905, at *7 ("Precedent teaches that . . . a disability determination must make a reasoned assessment of whether the total combination of claimant's impairments justify a disability finding, even if no single impairment standing alone would warrant the conclusion.").

In any event, and contrary to Hartford's assertion, one of Curtis's physicians did opine that her combination of impairments rendered her totally disabled. In July 2010, Dr. Ziffra stated that Curtis was unable to work "due to both psychiatric and physical symptoms," which "started around 2007" and had not improved (FF ¶ 54.) Although Dr. Ziffra references "psychiatric" symptoms, it is clear that he is referring to Curtis's cognitive impairments, as he specifically mentions her "significant problems with memory and other cognitive domains" in drawing his

conclusions. (*Id.*) Though Dr. Ziffra's July 2010 report was submitted almost a year after the August 2009 determinative date, his statement that Curtis's symptoms began in 2007 and his reliance on Dr. Leavitt's May 2009 report in reaching his conclusions demonstrate that his conclusions relate back to a time earlier than the determinative date.

Hartford also suggests that Curtis's cognitive impairments constitute a "mental illness" under the terms of the Plan and thus limit her to two years of benefits. (*See* Def.'s Br. at 44.) The Plan defines "mental illness," in relevant part, as "a psychological, behavioral, or emotional disorder or ailment or the mind." (FF ¶ 11.) Interpreting the terms of the Plan in the "ordinary and popular sense" and with any ambiguity construed in the insured's favor, as required by *Diaz*, 499 F.3d at 643, it is clear that Curtis's cognitive impairments, which primarily affect her learning, memory, and problem solving skills, are not the sort of mental health disorders Hartford intended the Plan to limit. Hartford has provided no evidence to show otherwise. Therefore, the "mental illness" limitation does not apply. *See Deal v. Prudential Ins. Co. of Am.*, 263 F.Supp.2d 1138, 1143 (N.D. Ill. 2003) (noting that the insurer bears the burden of proving the applicability of a mental illness policy exclusion in an ERISA claim).

### C. The combined effect of Curtis's physical and cognitive impairments precludes her from being able to perform "any occupation" within the meaning of the Plan.

#### 1. Hartford's VE could not identify any occupations that Curtis would be able to perform that met her income threshold when accounting for her combination of impairments.

Hartford contends it is Curtis's burden to present evidence from a VE stating there are no occupations she can perform. (Def.'s Br. at 29.) Hartford cites no authority for this srgument, and courts routinely have found an ERISA plaintiff to be disabled without a VE opinion. *See, e.g.*, *Rudzinski v. Metro. Life Ins. Co.*, No. 05 C 0474, 2007 WL 2746630 (N.D. Ill. Sept. 14, 2007); *LaBarge v. Life Ins. Co. of N. Am.*, No. 00 C 0512, 2001 WL 109527 (N.D. Ill. Feb. 6,

2001). In addition, Curtis did not need to provide her own VE opinion because even Hartford's VE, Jessie Hennessy, was unable to identify any jobs Curtis would be able to perform without additional training. Hennessy conducted three evaluations between July 2009 and March 2010 in order to determine Curtis's employability in light of her functional capacity restrictions. Two of Hennessy's evaluations, EAR 1 and EAR 3, are invalid because they were based on unreliable or incomplete medical evidence and did not consider Curtis's cognitive impairments. EAR 2, the only evaluation to consider Curtis's cognitive impairments, produced no occupations that Curtis reasonably would be able to perform without additional training. The Plan defines "any occupation" as one for which the insured employee "[is] qualified by education, training or experience." (FF ¶ 7.)

### a. EAR 1 and EAR 3 are invalid.

Hennessy completed EAR 1 on July 8, 2009, basing Curtis's qualifications profile on the functional limitations derived from her August 2008 FCE. (FF ¶ 75). The record contains evidence suggesting Curtis's condition had worsened between August 2008 and July 2009, including continued pain complaints, a surgery, and multiple injections. In addition, Dr. Cole, Curtis's treating physician, completed a new PCE in June 2009 that undermined the August 2008 FCE. In light of these developments, it was unreasonable for Hartford's VE to base EAR 1 on information derived from an FCE completed nearly a year before. For that reason alone, EAR 1, which concluded that Curtis would be able to work as an Office Nurse, Staff Nurse, Medical Case Manager, Nurse Consultant, Nurse Administrator, Nurse Educator, Care Coordinator Nurse, and Nursing Care Facility Nurse, is invalid.

More importantly, however, EAR 1 failed to consider how Curtis's cognitive impairments would affect her ability to perform the identified jobs. Even Hartford

acknowledged it should have incorporated Curtis's cognitive impairments in its analysis, as it later specifically instructed Hennessy to conduct EAR 2 in order to incorporate Dr. Leavitt's cognitive findings. (FF ¶ 78.) Not surprisingly, after Hennessy changed Curtis's profile in EAR 2 to reflect her cognitive impairments, the occupations identified in EAR 1 were no longer applicable.

At that point, Hartford should have recognized that the EAR 1 results were obsolete. Nevertheless, Hartford retained Hennessy a third time in March 2010 in order to determine whether the EAR 1 results were still valid in light of Dr. Lobel's February 2010 report. Hennessy relied solely on Dr. Lobel's functional capacity findings in determining Curtis's qualifications profile for EAR 3 and again concluded that Curtis would be able to work as an Office Nurse, Staff Nurse, Medical Case Manager, Nurse Consultant, Nurse Administrator, Nurse Educator, Care Coordinator Nurse, and Nursing Care Facility Nurse. (FF ¶ 86.) As noted above, Dr. Lobel's findings erroneously failed to account for a significant portion of Curtis's pain and are thus unreliable. This fact by itself is enough to invalidate EAR 3. Yet, in conducting EAR 3, Hennessy also discarded all of the changes she made to Curtis's profile in EAR 2 accommodating Curtis's cognitive impairments. Consequently, EAR 3 suffered the same flaw as EAR 1: it failed to account for any of Curtis's cognitive impairments. Its results, therefore, are unpersuasive and do not bear the weight Hartford wants the Court to place on them.

### b. EAR 2 did not identify any jobs Curtis reasonably would be able to perform.

Hartford instructed Hennessy to conduct EAR 2 in order to incorporate Dr. Leavitt's findings regarding Curtis's cognitive limitations and to determine whether the updated information changed the results of EAR 1. (FF ¶ 78.) Based on Dr. Leavitt's report, Hennessy concluded, among other things, that Curtis was unable to perform a variety of tasks and would instead require repetitive work with specific instructions in order to accommodate her inability to concentrate. (FF ¶ 79.) As a result, Hennessy determined that Curtis was unable to perform any of the occupations listed in EAR 1. Instead, when accounting for Curtis's cognitive impairments, Hennessy could only identify three occupations under the OASYS job matching system that purportedly matched Curtis's profile: Deputy Sheriff, Booking Police Officer, and Building Guard. (FF ¶ 81.) None of these jobs qualify as "any occupation" under the Plan because they require significant additional training.

Significantly, none of these jobs fell within the "closest" or even "good" level of occupations matching Curtis's profile. Indeed, Hennessy was unable to identify any "closest" or "good" occupations at all. (FF ¶ 80.) Rather, the only occupations Hennessy was able to identify fell within the "fair" level, which would require an employer to develop a plan in order to train Curtis in the skills necessary to perform the job, and the "potential" level, which indicate "low" transferability and also require "plan development and training." (FF ¶¶ 74, 81.)

As noted above, the Plan defines "any occupation" as "an occupation for which you are qualified by education, training, or experience." (FF ¶ 7.) Notably, the Plan does not define "any occupation" as an occupation for which a person *could become* qualified by education, training, or experience. Hartford knows how to write a policy that says claimants are not totally disabled if they can be trained in a new job. *See O'Reilly v. Hartford Life & Accident Ins. Co.*,

272 F.3d 955, FN 1 ("Total Disability means . . . you are prevented by Disability from doing any occupation or work for which you are or could become qualified by: (1) training; (2) education; or (3) experience."). That is not what Curtis's policy says. Instead, the plain language of the Plan makes clear that "any occupation" must be one for which Curtis *already* is qualified. An occupation requiring an employer to develop a plan in order to train Curtis is not one for which Curtis already is qualified.

Additionally, one of the three "fair" occupations Hennessy identified – Booking Police Officer – has an SVP of 4, which would require "over 3 months up to and including 6 months" of training. (FF ¶ 82, *Dictionary of Occupational Titles*, Appendix C.) Revealingly, Hartford eliminated all "fair" and "potential" jobs with an SVP higher than 3 in EAR 1 and EAR 3, correctly acknowledging that Curtis would be unable to perform those jobs without additional training. (FF ¶¶ 76, 86.) Of course, Hartford did not need to rely on any "fair" and "potential" jobs to establish Curtis's employability in EAR 1 or EAR 3, as Hennessy identified occupations within the "closest" level that Curtis would be able to perform. But when EAR 2 produced only "fair" and "potential" jobs matching Curtis's profile, Hartford could no longer eliminate the "fair" occupations with an SVP higher than 3, as doing so would eliminate a third of the jobs allegedly matching Curtis's profile. This discrepancy is telling.

Even the two identified occupations in EAR 2 with an SVP of 3 – Deputy Sheriff and Building Guard – do not qualify as "any occupations" under the Plan, as they would require Curtis to undergo "over 1 month up to and including 3 months" of training and are thus inconsistent with the Plan's requirement that she already be qualified for the position. *Dictionary of Occupational Titles*, Appendix C. Further, it is common sense that Curtis's nursing career did not provide her with the education, training, or experience necessary to be a

Deputy Sheriff or Building Guard, whose routine tasks include patrolling courthouses to provide security, escorting prisoners and criminal defendants to and from prisons or jails, standing guard during court proceedings, and making arrests. (R. 543-44.)

Hennessy was able to identify jobs Curtis could perform using both the OASYS system and the Occupational Outlook Handbook in EAR 1 and EAR 3, but she could not identify any jobs in the Occupational Outlook Handbook for which Curtis had transferable skills in EAR 2. While it is Curtis's burden to prove she is disabled from any occupation, Hartford's inability to identify any job Curtis would be able to perform in light of her physical and cognitive impairments is compelling evidence that no such jobs exist. If such jobs existed, Hartford had every incentive, and three chances, to identify them.

### 2. Curtis is not estopped to claim she was disabled for purposes of Hartford's Plan as of August 6, 2009 because she applied for Social Security benefits as of May 4, 2010.

Hartford argues that Curtis is estopped to argue that she was disabled from any occupation as of August 6, 2009 because, on her Social Security disability application, she alleged she first became disabled as of her 50th birthday in May 2010. Hartford also argues that the ALJ's finding that Curtis first became disabled under the Social Security Act in May 2010 factually proves she was not disabled under the Plan as of the August 2009 determinative date. Neither argument is persuasive.

The Social Security Act and the Plan have different standards to determine disability. For example, the Plan has a minimum income threshold, whereas the Social Security Act contains no such provision. Moreover, the Social Security Act requires an ALJ to consider not only a person's physical and mental capabilities, but also her age, education, and work experience before reaching a disability determination. 20 C.F.R. § 404.1520. Accordingly, this

41

Circuit has definitively ruled that Social Security opinions do not provide grounds for estoppel in ERISA claims. *Krolnik*, 570 F.3d at 844 ("The district judge should compare the Social Security rules with the Plan's terms, to ascertain whether the award of Social Security benefits is informative, but this differs from estoppel.") (internal citations omitted).

Nor does the ALJ's finding that Curtis became disabled as of her 50th birthday under the Social Security Act support a factual finding that she was not disabled under the Plan in August 2009. Under the Social Security Act, a person "closely approaching advanced age (age 50-54)" has a greater likelihood of being approved for Social Security disability benefits than a younger person. *See* 20 C.F.R. § 404.1563 (noting that "[i]f you are closely approaching advanced age (age 50-54), we will consider that your age along with a severe impairment(s) and limited work experience may seriously affect your ability to adjust to other work"). Recognizing this, Curtis strategically alleged that she first became disabled under the Social Security Act on May 4, 2010 – her 50th birthday. (FF ¶ 90.) As such, the ALJ had no reason to consider whether Curtis became disabled at any time before that. In any event, as noted above, the Social Security Act and the Plan have different disability standards, so the ALJ's finding is not dispositive of Curtis's ERISA claim.

In the alternative, Hartford argues that the ALJ's decision proves that Curtis is disabled due to a "mental illness" and that she is therefore limited to two years of benefits under the Plan. (Def.'s Br. at 45.) This argument also is unpersuasive. The ALJ determined that Curtis had "significant limitations resulting from her mental impairments" after reviewing Dr. Ziffra's July 2010 report, which noted that Curtis's "problems with low energy and cognition make it difficult for her to start and complete tasks" and specifically referenced her "significant problems with

memory and other cognitive domains." (FF ¶¶ 54, 55, 93.) The Court already has explained that these cognitive limitations do not constitute a "mental illness" under the Plan.

Hartford also argues that Curtis is not disabled based on the reports of three non-examining physicians who conducted file reviews for the SSA. (Def.'s Br. at 39-43.) Hartford further contends that the reports from two of these doctors are "wholly consistent with [the findings] of Dr. Lobel and not materially different from those of Dr. Cole." *Id.* at 41. None of the SSA doctors upon whom Hartford relies ever examined Curtis and the Court gives little weight to their opinions. Moreover, the Court already has explained that Dr. Lobel's findings are materially different than Dr. Cole's. The Court has reviewed Hartford's argument and the underlying documents and, for the reasons already stated in this Memorandum Opinion and Order, does not feel the need to address the issue further.

Accordingly, Curtis is not estopped by her application for Social Security benefits to argue that she was disabled within the meaning of Hartford's Plan as of the determinative date.

**D. Hartford's contract argument is without merit.**

Lastly, Hartford argues that Curtis is barred from receiving benefits because she did not fulfill her contractual requirements. Hartford contends that, based on the Plan's "proof of loss" clause, Curtis had a contractual obligation to submit to the Plan administrator evidence Hartford deemed sufficient to establish her entitlement to benefits under the Plan. (Def.'s Br. at 30-36.) According to Hartford, Curtis failed to meet that obligation because none of the evidence she submitted to the Plan administrator showed she was disabled to Hartford's satisfaction. *Id.* Thus, Hartford reasons, Curtis did not perform all of her obligations under the controlling contract, so Hartford's duty to pay never arose. *Id.*

This argument fails. Hartford is essentially attempting to bypass the Court's prior rulings [*see* DE##66, 74] that Hartford's denial of benefits is to be reviewed *de novo*. The practical effect of Hartford's argument is that anytime a plan requires proof of loss "satisfactory to us," the plan administrator's decision is insulated from plenary judicial review, thereby nullifying any distinction between the *de novo* and arbitrary and capricious standards. But, as the Seventh Circuit recognized in *Diaz v. Prudential Ins. Co. of America*, 424 F.3d 635 (7th Cir. 2005), every insurance policy requires a claimant to submit proof of loss; "the alternative would be to hand money out every time someone knocked on the door, which is obviously out of the question." *Diaz*, 424 F.3d at 637. Accordingly, the *Diaz* court held that "a plan's requirement that an applicant submit 'satisfactory proof of entitlement' does not necessarily mean that a plan administrator has discretion, because every plan requires submission of documentary proof, and the administrator is entitled to insist on something like a doctor's note rather than one's latest telephone bill." *Id.* The Court already has determined that this case is to be reviewed *de novo*, and Hartford's proof of loss clause does not change the standard of review here.

As the Court already has noted, under the *de novo* standard of review, the question is not whether Hartford gave Curtis a full and fair hearing at the administrative level. Rather, the Court must decide the ultimate question of whether Curtis is entitled to the benefits she seeks under the Plan. *Diaz*, 499 F.3d at 643 (7th Cir. 2007). In *Krolnik*, the Seventh Circuit emphasized that, because the Court decides for itself where the truth lies, it is not concerned with the evidence the plan administrator reviewed nor the weight the plan administrator attributed to it. *See Krolnik*, 570 F.3d at 843 ("If the plaintiff says that a fire at his home destroyed a valuable painting, and the insurer declines indemnity after finding that (a) there was no such painting, and (b) the fire was caused by arson, the federal judge won't ask what evidence the insurer considered. The

court will decide for itself where the truth lies."). Accordingly, it is irrelevant in this litigation whether Hartford is satisfied with the proof of loss Curtis submitted.

**E. Prejudgment Interest**

A presumption in favor of prejudgment interest is specifically applicable in ERISA cases. *Fritcher v. Health Care Service Corp.*, 301 F.3d 811, 820 (7th Cir. 2002). "[P]rejudgment interest typically accrues from the date of loss or the date on which the claim accrued" in order to "put a party in the position that it would have been in had it been paid immediately." *Am. Nat. Fire Ins. Co. v. Yellow Freight Sys., Inc.*, 325 F.3d 924, 935 (7th Cir. 2003) (citations omitted). Absent special circumstances, compound interest is the norm in federal matters. *Cabernoch v. Union Labor Life Ins. Co.*, No. 06 C 1515, 2009 WL 2497669 at *4 (N.D. Ill. Aug. 14, 2009) (citing *Amr. Nat. Fire Ins. Co.*, 325 F.3d at 938).

The Court finds no evidence to rebut the presumption in favor of prejudgment interest in this case, nor are there any special circumstances that would preclude the compounding of interest. Therefore, the Court awards prejudgment interest compounded monthly from August 6, 2009 to the present. *See Cabernoch*, 2009 WL 2497669 at *4 ("Because monthly compounding of interest is standard on everything from mortgages to credit cards to car loans, such compounding is appropriate here. By compounding the interest at a lesser frequency, Defendants would be profiting from their wrong and Plaintiff would not be compensated fully for the lost value of her money in the marketplace.").

Curtis cites 215 ILCS 5/357.9 arguing that the prejudgment interest rate should be 9%. (Plaintiff's Brief [88] at 29.) There is nothing in the Illinois statute that suggests it applies in this case. Curtis cites no case that suggests the statute should apply in this case and offers no argument or reason why the statute applies. In *Gorenstein v. Quality Enterprises, Inc.*, 874 F.2d

431 (7th Cir. 1989), the Seventh Circuit suggested that district courts should use "the prime rate for fixing prejudgment interest where there is no statutory interest rate." 874 F.2d at 436. Accordingly, the Court will use the prevailing prime rate of 3.25%. *See* http://www.bankrate.com/rates/interest-rates/wall-street-prime-rate.aspx.

## CONCLUSION

For the foregoing reasons, the Court will enter judgment in favor of Curtis and against Hartford. Curtis is entitled to monthly payments due under the terms of the Plan, as well as all back payments, plus prejudgment interest, compounded and retroactive to August 6, 2009. The parties shall meet and confer and, by September 8, 2014, submit a proposed judgment order to the Court in accordance with Rule 58 of the Federal Rules of Civil Procedure consistent with this Memorandum Opinion and Order containing an appropriate calculation of Curtis's past due benefits and prejudgment interest. Status hearing set for September 9, 2014 at 10:00 a.m. If a proposed judgment order has been submitted before that date, the hearing will be stricken and no appearance will be necessary.

Plaintiff also requests an award of attorneys' fees. The parties shall meet and confer and, by September 8, 2014, submit an agreed proposed order to the Court with an agreed calculation of Curtis's attorneys' fees. If the parties cannot come to an agreement, the parties shall submit an agreed proposed briefing schedule on or before that date and follow the procedure set forth in

Local Rule 54.3.  If the parties need more time to submit a proposed judgment order or to confer about attorneys' fees they should jointly contact the Court's courtroom deputy and these dates can be reset.

It is so ordered.

Jeffrey T. Gilbert
United States Magistrate Judge


Dated:   August 20, 2014